CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED
August 19, 2026
LAURA A. AUSTIN, CLERK
BY: /s/ M. Poff
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| **DEONTA J. HICKS,** | ) | |
| **Plaintiff,** | ) | **Case No. 7:24-cv-00360** |
| | ) | |
| **v.** | ) | |
| | ) | **By: Michael F. Urbanski** |
| **CHADWICK DOTSON, et al.,** | ) | **Senior United States District Judge** |
| **Defendants.** | ) | |

# MEMORANDUM OPINION

Deonta J. Hicks, a state inmate proceeding pro se, filed this civil action under 42 U.S.C. § 1983 against former Virginia Department of Corrections (VDOC) Director Chadwick Dotson and other individuals employed by the VDOC. Hicks asserts federal constitutional claims stemming from his placement in the Restorative Housing Unit (RHU) at River North Correctional Center (RNCC), as well as a claim of gross negligence in violation of Virginia law.

The case is presently before the court on a motion for summary judgment filed by defendants Dotson, David Anderson, Jason Bateman, Lukas Bolt, Henry May, Gregory Holloway, and C. MacVean. ECF No. 34. The motion specifically addresses Hicks's claims under the Eighth Amendment, the Due Process Clause of the Fourteenth Amendment, and state law. Hicks has filed a sworn response in opposition to the motion, along with other declarations. ECF No. 39 and 44.[1] For the following reasons, the motion for summary judgment is **GRANTED** as to the claims addressed in the motion. The court will direct the

[1] Hicks's motion for leave to file a declaration signed by Joshua Murphy, ECF No. 44, is granted, and the court will consider the declaration to be part of the record on summary judgment.

Clerk to add E. Earhart[2] as a defendant and require the defendants to respond to other claims asserted in the amended complaint that have not yet been addressed.

## I. Factual Background

On October 27, 2023, Hicks was placed under investigation following an encounter with A. Hawks, a female nurse at RNCC. Earhart Aff., ECF No. 35-1, ¶ 8. The investigation revealed that Hicks had approached the nurse and "stated that he was going to be released soon, that he would move in and she would take his last name, and that he bet her husband is 'soft and wouldn't be a problem.'" Id. Based on the statements reportedly made to the nurse, an institutional investigator charged Hicks with the disciplinary offense of making threats or plans to kill any person (VDOC Offense Code 100B). Earhart Aff. Encl. B, ECF No. 35-1 at 26. The charge was assigned Case No. RNCC-2023-1947. Id.

Hicks was placed in the RHU on October 27, 2023. Earhart Aff. ¶ 9; Am. Compl., ECF No. 15, at 4. That same day, Hicks signed an Institutional Classification Authority (ICA) hearing notification form, which noted that Hicks had been "referred to RHU per Intel for threatening staff" and that he would be scheduled to appear before the ICA on or after October 31, 2023. Earhart Aff. Encl. C, ECF No. 35-1 at 43. Hicks indicated that he wished to attend the hearing. Id.

The ICA hearing was conducted on October 31, 2023, and Hicks appeared for the hearing, along with defendants MacVean, Earhart, Bateman, May, and other officials. Am. Compl. at 4. Hicks alleges in his verified amended complaint that he witnessed Earhart have a private conversation with Bateman and that the team subsequently "recommended [he]

---

[2] Based on one of the declarations filed in support of the pending motion for summary judgment, Earhart's last name appears to be misspelled in the amended complaint.

remain in RHU status due to the fact [he] was pending an adjustment hearing for a 100(B) infraction." Id. The ICA hearing report indicates that the ICA, identified as defendant Bolt, recommended an internal status change to "RHU – Restorative Housing" and that defendants May and Bateman approved the decision. Earhart Aff. Encl. C, ECF No. 35-1 at 44. Hicks alleges that Bateman "violated policy and law" by participating in the hearing and that he subsequently filed a grievance regarding the matter. Am. Compl. at 4. Hicks also alleges that Bolt was not present for the hearing and therefore violated his right to due process by making the initial recommendation. Id. at 12.

On November 6, 2023, Hicks signed an ICA hearing notification form advising that he was scheduled to appear for another ICA hearing on or after that date. Earhart Aff. Encl. D, ECF No 35-1 at 45. Hicks "mistakenly" checked a box indicating that he did not wish to attend the hearing. Am. Compl. at 5. The hearing was conducted on November 6, 2023. Id. at 46. The hearing report indicates that the ICA, identified as defendant May, recommended that Hicks remain in the RHU at that time and that defendant Bateman approved the recommendation. Id.

Institutional Hearings Officer A. King conducted the disciplinary hearing in Case No. RNCC-2023-1947 on November 14, 2023. Earhart Aff. Encl. B, ECF No. 35-1 at 25. Hicks attended the hearing with a staff advisor. Id. The hearings officer ultimately found Hicks guilty of the lesser offense of threatening bodily harm to any person verbally, by gesture or actions, or in writing (VDOC Offense Code 129), and the officer imposed the following penalty: "Loss of Good Time – Imposed Value: 100 days." Id.

On November 15, 2023, an ICA hearing was conducted for a "Transfer and Keep Separate" review due to the offense conduct giving rise to the disciplinary charge. Earhart Aff. ¶ 12; Earhart Aff. Encl. E, ECF No. 35-1 at 47. Hicks was not advised of the hearing or allowed to appear. Pl.'s Sworn Resp. Opp'n, ECF No. 39, at 5. The ICA, identified as May, recommended that a "keep separate" order be entered and that Hicks be transferred to Keen Mountain Correctional Center (KMCC) or Sussex I State Prison. Id. Defendant C. MacVean and another prison official, T. Ford, approved the recommendations. Earhart Aff. Encl. E, ECF No. 35-1 at 47. Ford noted that a transfer was "approved to alleviate a keep separate issue" and that Hicks could "be managed at a Security Level (SL) 4 facility." Id. at 48. Hicks alleges that he was never informed of the "keep separate" order and that he "just thought [he] had a threatening infraction" and that his treatment was based on the fact that Nurse Hawks "had a relationship" with defendant Earhart. Pl.'s Sworn Resp. in Opp'n at 5.

On November 15 or 16, 2023, an ICA hearing was conducted to review Hicks's security and good time levels. Am. Compl. at 5; Earhart Aff. Enc. F, ECF No. 35-1 at 49. Hicks was not advised of the hearing or allowed to appear. Am. Compl. at 5; Pl.'s Sworn Resp. Opp'n at 9. On November 17, 2023, the ICA, identified as May, recommended that Hicks's good time level be changed to Good Conduct Allowance (GCA) Level 4, meaning that he would earn "no good time for time served towards his sentence." Earhart Aff. ¶ 13. The ICA also recommended that Hicks remain at Security Level 4. Id.

On November 21, 2023, Hicks filed a written complaint alleging that he was being discriminated against on the basis that his disciplinary infraction was committed "against a person that the MDT team personnel member had a sexual relationship with." Am. Compl.

at 6. Hicks asserted that other inmates had been placed in the RHU after committing the same infraction and that they were "released to general population before [him]." Id. On December 10, 2023, Hicks filed another written complaint alleging that a VDOC policy had been violated as a result of him not being "reviewed by the MDT team every seven days for [his] first 60 days on RHU status." Id. Hicks alleges that defendant Holloway ultimately denied his related grievances. Id. at 13.

On December 20, 2023, Hicks signed an ICA hearing notification form advising him that he was scheduled to appear before the ICA on or after December 21, 2023. Earhart Aff. Encl. G, ECF No. 35-1 at 50. Hicks noted that he wished to attend the hearing and requested that Nurse Hawks appear as a witness. Id. Following the hearing conducted on December 21, 2023, the ICA recommended that Hicks remain in the RHU at that time, and defendant Bateman approved the decision. Id. at 51.

Hicks was transferred to KMCC on January 10, 2024. Earhart Aff. ¶ 15. The transfer did not involve any change to his security level, and he remained classified at Security Level 4. Id.

Hicks had another ICA hearing after arriving at KMCC, and the decision was made for him to remain in the RHU "based on recent disruptive behavior that resulted in . . . a 120B infraction." Fields Aff. Encl. B, ECF No. 28-1 at 7. Following another ICA hearing on January 30, 2024, Hicks was released to general population. Id. at 8; Fields Decl. Encl. A, ECF No. 28-1 at 4.

VDOC Operating Procedure (OP) 841.4 outlines procedures applicable to the assignment of inmates to RHUs and "establishes the minimum standards for the operation

of these units and for the care and custody of the inmates." OP 841.4 at 5 (eff. July 1, 2023), Earhart Aff. Encl. A, ECF No. 35-1. RHU cells are typically designed to hold one inmate per cell, and the cells "should be well ventilated, adequately lighted, appropriately heated and should always be maintained in a sanitary condition." Id. § IX(B). RHU inmates "are generally subject to the same correspondence regulations and privileges as inmates assigned to full privilege general population," with the exception of not having access to electronic messaging via a kiosk. Id. RHU inmates also receive the "same number and type of meals served to full privilege general population," and they have access to legal services, law library materials, and legal calls. Id. However, they are only allowed to make two telephone calls per month, and they only have access to non-contact visitation. Id. § IX(B)–(C). Additionally, RHU inmates must be offered "the opportunity to shower and shave not less than three times each week," and they must "be afforded a minimum of four hours of meaningful out of cell activity, programmatic interventions, or other congregate activities per day" unless a facility unit head determines that a lockdown is required to ensure the safety of the institution. Id. § IX(C)–(D).

OP 841.4 also provides that correctional officers "must strip search each [RHU] inmate before the inmate is removed or allowed to leave their cell," Id. § VIII(A), and Hicks alleges that he was "subjected to a highly intrusive strip search every time he left his cell" in the RHU. Pl.'s Sworn Resp. Opp'n at 3. Hicks also alleges that he could not order "food items" from the commissary and that the light in his RHU cell at RNCC "remained on bright for 16 hours of the day from 5:30 a.m. to 10:00 p.m." before being replaced by a "night light" that created "sensory stimuli." Id. at 3–4. Additionally, after being placed in the

RHU, Hicks was removed from an "HVAC/R" class, and he lost his job in the kitchen. Id. at 4, 6.

Hicks alleges that his stay in the RHU was prolonged "out of retaliation due to the fact [his] infraction was against a person that the MTD team personnel member had a sexual relationship with," id. at 15, and he has since identified that staff member as Earhart. See Pl.'s Sworn Resp. Opp'n at 7. Hicks also alleges that MacVean prevented him from being released from the RHU any sooner because Hicks challenged the legality of the Step Down Program, which he claims to have been subject to while in the RHU. Am. Compl. at 13; see also Pl.'s Sworn Resp. Opp'n at 4 (asserting that he "griev[ed] his placement in Restorative Housing and was told by Unit Manager MacVean due to [Hicks] advising other inmate[s] about the Step Down Program being illegal that I would stay on Step Down.").

## II. Procedural History

Hicks initially filed this civil action under 42 U.S.C. § 1983 in June 2024. In December 2024, he filed the operative amended complaint. The first page of the amended complaint names as defendants former VDOC Director Chadwick Dotson, RNCC Warden David Anderson, Assistant Warden Jason Bateman, Lieutenants Lukas Bolt and Henry May, VDOC Regional Operations Chief Gregory Holloway, and Unit Manager C. MacVean. Am. Compl. at 1. The same defendants are included in a separate list of "parties" identified at the end of the amended complaint. Id. at 11–13. Although those lists do not include RNCC Chief of Housing and Programs E. Earhart, Earhart is identified as a "defendant" on another page of the pleading, id. at 4, and the court will assume that Hicks intended to proceed against him.

Hicks's amended complaint states that he is seeking relief for alleged violations of his rights under the Eighth and Fourteenth Amendments, and he references "due process," "deliberate indifference, and "gross negligence" in the same paragraph. Id. at 11. Elsewhere in the complaint, Hicks appears to assert claims of discrimination and retaliation. Id. at 6, 13.

Defendants Dotson, Anderson, Bateman, Bolt, May, Holloway, and MacVean have moved for summary judgment on the claims under the Eighth Amendment, the Due Process Clause of the Fourteenth Amendment, and Virginia law. Hicks has responded to the motion, and the matter is ripe for review.

## III. Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, the court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013) (quoting Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986)).

When ruling on a motion for summary judgment, the court must "view the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party." Id. at 312. The court may not "weigh the evidence or make credibility determinations." Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 568 (4th Cir. 2015). "To survive summary judgment, 'there must be evidence on which the jury could

reasonably find for the nonmovant.'" Lee v. Town of Seaboard, 863 F.3d 323, 327 (4th Cir. 2017) (brackets omitted) (quoting Anderson, 477 U.S. at 252).

"As a general rule, when one party files a motion for summary judgment, the nonmovant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion." Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). "However, it is well-established that a verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." Goodman v. Diggs, 986 F.3d 493, 498 (4th Cir. 2021) (internal quotation marks omitted); see Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). Nonetheless, conclusory allegations in a verified complaint or opposing affidavit are insufficient to survive summary judgment. See Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013) ("Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence.").

## IV. Discussion

### A. Claims Challenged in the Motion for Summary Judgment

#### 1. Eighth Amendment

Hicks first contends that his placement in the RHU violated the Eighth Amendment to the United States Constitution, which prohibits the infliction of "cruel and unusual

punishments." U.S. Const. amend. VIII. It is "well established that 'the conditions under which [an inmate] is confined are subject to scrutiny under the Eighth Amendment.'" Cartagena v. Lovell, 103 F.4th 171, 181 (4th Cir. 2024) (quoting Helling v. McKinney, 509 U.S. 25, 31 (1993)). "But such scrutiny 'does not mandate comfortable prisons,' instead permitting conditions that are 'restrictive and even harsh.'" Id. (quoting Rhodes v. Chapman, 452 U.S. 337, 349, 347 (1981)).

"Like any other Eighth Amendment claim, an Eighth Amendment conditions of confinement claim has (1) objective and (2) subjective components." Porter v. Clarke, 923 F.3d 348, 355 (4th Cir. 2019) (internal quotation marks omitted). "Only extreme deprivations are adequate to satisfy the objective component." De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2023). Specifically, an inmate "must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions, or demonstrate a substantial risk of such serious harm resulting from [his] unwilling exposure to the challenged conditions." Jones v. Solomon, 90 F.4th 198, 209 (4th Cir. 2024) (internal quotation marks omitted). To satisfy the subjective component, "a prisoner must show that prison officials . . . had a 'sufficiently culpable state of mind,'" and, in this context, "that state of mind must be at least 'deliberate indifference' to the inmate's 'health or safety.'" Cartagena, 103 F.4th at 181 (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)).

Deliberate indifference is a "very high standard," Ford v. Hooks, 108 F.4th 224, 229 (4th Cir. 2024) (internal quotation marks omitted), that is equivalent to "criminal recklessness," Cartagena, 103 F.4th at 181. It "requires proof that the prison official subjectively 'knew of and disregarded an excessive risk to inmate health or safety.'" Id.

(brackets omitted) (quoting Farmer, 511 U.S. at 837). "Thus, to show that a prison official was deliberately indifferent, the prisoner must show that the official 'consciously disregarded a substantial risk of serious harm.'" Cartagena, 103 F.4th at 181 (brackets omitted) (quoting Farmer, 511 U.S. at 839).

Here, the record indicates that Hicks was moved to the RHU at RNCC on October 27, 2023, after he was accused of threatening a staff member, and that he remained in the RHU until he was transferred to KMCC on January 10, 2024—a period of 76 days. He then remained in the RHU for an additional 20 days after he arrived at KMCC. While Hicks complains about various aspects of his conditions of confinement during that period, including the particular lighting utilized in the RHU cells, the fact that he and other RHU inmates were strip searched before exiting their cells, and the fact that he could not order food items from the commissary, Hicks has not alleged or attempted to prove that he suffered any serious or significant physical or emotional injury resulting from the challenged conditions. Nor has he proffered evidence sufficient to show that the conditions of confinement to which he was subject for approximately three months posed a significant risk of serious physical or psychological harm. Cf. Porter, 923 F.3d at 357 (concluding that the "challenged conditions of confinement on Virginia's death row—under which Plaintiffs spent, for years, between 23 and 24 hours a day alone, in a small cell with no access to congregate religious, educational, or social programming—pose a substantial risk of serious psychological and emotional harm") (emphasis added) (internal quotation marks and alterations omitted); Rivera v. Mathena, 795 F. App'x 169, 175 (4th Cir. 2019) (holding that "as a result of his four years in segregation, Rivera faced a substantial risk of serious

psychological harm which was increased by shower and exercise deprivations, as his injuries demonstrate").

Hicks has also failed to present evidence sufficient to satisfy the subjective element. While Hicks refers to the RHU as an illegal program, neither administrative segregation nor long-term solitary confinement is "per se cruel and unusual." Hope v. Harris, 861 F. App'x 571, 582 (5th Cir. 2021) (citing Hutto v. Finney, 437 U.S. 678, 686 (1978)); see also Porter, 923 F.3d at 362–63 & n.2 (recognizing that "a legitimate penological interest can support even prolonged solitary detention of a particular inmate"). Even if Hicks remained in the RHU longer than other inmates charged with the same offense conduct, as he asserts in his amended complaint, the duration of his confinement pales in comparison to the prolonged or indefinite terms of solitary confinement described in other cases in which the subjective element of deliberate indifference has been found to be satisfied. See Porter, 923 F.3d at 364; see also Thorpe v. Clarke, 37 F.4th 926, 931, 941 (4th Cir. 2022) (concluding that prisoners "living in long-term solitary confinement" at Virginia's two supermax facilities—"some as long as 24 years"—"adequately pleaded both that they suffered extreme injuries and that Defendants were aware of them"). And he has not put forth any other evidence that would allow a reasonable jury to find that prison officials consciously disregarded a significant injury or substantial risk of serious harm. Thus, on this record, the motion for summary judgment filed by Dotson and other defendants must be granted with respect to the Eighth Amendment claim asserted against them.

**2. Due Process**

Hicks also claims that he was deprived of procedural due process in violation of the Fourteenth Amendment. The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. "To establish that a government actor violated this proscription, 'a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law.'" Cartagena, 103 F.4th at 182 (quoting Prieto v. Clarke, 780 F.3d 245, 248 (4th Cir. 2015)). In the absence of a protected interest, "a prisoner cannot invoke the procedural protections of the Due Process Clause." Prieto, 780 F.3d at 248 (internal quotation marks omitted).

A protected liberty interest may arise from the Constitution itself or through state laws or policies. Wilkinson v. Austin, 545 U.S. 209, 221 (2005). However, because the Supreme Court has already held that "the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement," id. (citing Meachum v. Fano, 427 U.S. 215, 225 (1976)), the court must determine whether state law provides such an interest in the context of this case.

To establish a liberty interest derived from state law, an inmate in Virginia must "point to a Virginia law or policy providing him with an expectation of avoiding the conditions of confinement and demonstrate that those conditions are harsh and atypical in relation to the ordinary incidents of prison life." Prieto, 780 F.3d at 252. In deciding whether the conditions of confinement to which an inmate were transferred were "harsh and atypical," courts consider: "(1) the magnitude of confinement restriction[s]; (2) whether the administrative segregation is for an indefinite period; and (3) whether assignment to

administrative segregation had any collateral consequences on the inmate's sentence." Cartagena, 103 F.4th at 183 (internal quotation marks omitted).

Here, the first factor arguably weighs in Hicks's favor, given that some of the conditions to which he was subject are "comparable to those described" in cases in which a cognizable liberty interest was found. Id. For instance, the record indicates that he was potentially confined in his cell up to 20 hours a day while housed in the RHU, that he was required to be strip searched every time he left his cell, that he could only make two telephone calls per month, and that he only had access to non-contact visitation. See id. (finding that the first factor "might . . .be satisfied" where the plaintiff alleged that he was "locked down in a cell 21 hours a day, that recreation took place in a cage, . . . that contact with the outside world and other inmates was limited," and that "he was subject to strip searches when he left his cell") (emphasis added).

Even if the first factor weighs in Hicks's favor, however, "the severity of the conditions alone are insufficient to create a liberty interest." Smith v. Collins, 964 F.3d 266, 277 (4th Cir. 2020)). Instead, the court must consider "the indefiniteness of solitary confinement, as well as its duration in determining whether prisoners have a sufficient liberty interest in avoiding such confinement." Id. These additional considerations strongly weigh against finding a liberty interest in this case. Hicks's confinement in the RHU at RNCC lasted only 76 days, followed by an additional 20-day period of confinement in the RHU at KMCC, after he was transferred to that facility. Thus, his placement in the RHU was not indefinite, and the overall period of confinement was far briefer than the duration that courts have found to implicate a protected liberty interest. Compare id. at 279 (concluding

that "four-plus years in solitary confinement" was "significant enough to tip the indefiniteness factor in Smith's favor"), and Incumaa v. Stirling, 791 F.3d 517, 531 (4th Cir. 2015) (addressing "an exceptional 20-year stint in highly restrictive solitary confinement"), with Cartagena, 103 F.4th at 183–84 (affirming the dismissal of a due process claim premised on an 18-month term of confinement in segregation where the inmate acknowledged that the conditions of his confinement could be relaxed as time passed), and Kimble v. Swink, No. 22-6437, 2024 WL 688105, at *6 (4th Cir. Feb. 20, 2024) (affirming the dismissal of a due process claim where an inmate was confined in segregation "only 398 days," during which time "he was held in his cell for 22 hours per day" and "the cell was brightly illuminated from 5:45 a.m. to 11:30 p.m. each day," and the inmate was subject to even greater restrictions during the first 138 days, including only "one hour of recreation, five days per week," and "only one non-contact visit per month").

Finally, as to the third factor, there is no evidence that Hicks's placement in the RHU had any collateral consequences on his sentence. See Smith, 964 F.3d at 279–80 (noting that such consequences may take the form of parole ineligibility or an "inability to earn good-time credits as a collateral consequence" of an inmate's segregation status). Although Hicks was penalized with a loss of 100 days of earned good time and subsequently classified at lower class level, there is no evidence that either consequence resulted from his temporary placement in the RHU. Instead, it is undisputed that the loss of earned good time was imposed as a penalty for his disciplinary conviction.[3] Likewise, the defendants' evidence

[3] Hicks's amended complaint does not challenge the adjudication of his disciplinary charge. Even if it had, it is well settled that an inmate "may not challenge the validity of a disciplinary conviction [resulting in the loss of good time credits] through a damages suit under § 1983 . . . 'unless the plaintiff can demonstrate

indicates that the change to Hicks's class level for earning good time "resulted from his recent disciplinary conviction, and was not caused by his being housed in RHU." Earhart Aff. ¶ 13. And while Hicks asserts in his response in opposition that he was "denied parole," he specifically attributes the unfavorable parole decision "to the 129 infraction," Pl's Sworn Resp. Opp'n at 8, rather than his stint in the RHU.[4]

For these reasons, the court concludes that Hicks has failed to establish that his placement in the RHU implicated a protected liberty interest. This is true even if Hicks lost his prison job or was removed from an HVAC/R class as a result of being placed in the RHU. Appellate courts, including the Fourth Circuit, have long held that an inmate does "not have a constitutionally protected liberty or property interest in his prison job," and Hicks does not point to any state law or policy that confers a legitimate claim of entitlement to continued employment while in the custody of the VDOC. Backus v. Ward, No. 98-6331, 1998 WL 372377, at *1 (4th Cir. June 8, 1998); see also DeWalt v. Carter, 224 F.3d 607, 613 (7th Cir. 2000); James v. Quinlan, 866 F.2d 627, 629-30 (3d Cir. 1989). Likewise, the denial of access to a specific educational program does not deprive an inmate of a protected liberty interest. See Toney v. Owens, 779 F.3d 330, 342 (5th Cir. 2015); Arango v. Winstead, 352 F. App'x 664, 666 (3d Cir. 2009); Higgason v. Farley, 83 F.3d 807, 809 (7th Cir. 1996). And in

---

that the conviction . . . already has been invalidated.'" Moskos v. Hardee, 24 F.4th 289, 295 (4th Cir. 2022) (quoting Heck v. Humphrey, 512 U.S. 477, 487 (1994)); see also Edwards v. Balisok, 520 U.S. 641, 648 (1997) (applying Heck to a claim for declaratory relief and money damages that necessarily implied the invalidity of the punishment imposed). Hicks does not allege that his disciplinary conviction has been reversed, invalidated, or expunged.

[4] According to publicly available information, the Parole Board denied parole on July 25, 2024. See Parole Decisions for July 2024, available at https://vpb.virginia.gov/media/rbpjcr3z/vpb-decisions-july24.pdf (last accessed Aug. 17, 2026). In its decision, the Parole Board cited to Hicks's "[e]xtensive criminal record" and determined that "[r]elease at this time would diminish [the] seriousness" of his criminal offenses. Id.

the absence of a protected interest, "the Due Process Clause requires no process." Cartagena, 103 F.4th at 184. Accordingly, the motion for summary judgment filed by Dotson and other defendants will be granted with respect to the claim for denial of procedural due process in violation of the Fourteenth Amendment.

### 3. Gross Negligence

Summary judgment is also warranted on the claim of gross negligence under Virginia law. "[T]he standard for gross negligence in Virginia is very high." Doe v. Russell Cnty. Sch. Bd., 292 F. Supp. 3d 690, 716 (W.D. Va. 2018). "Gross negligence is 'a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person.'" Elliott v. Carter, 292 Va. 618, 622, 791 S.E.2d 730, 732 (Va. 2016) (quoting Cowan v. Hospice Support Care, Inc., 268 Va. 482, 487, 603 S.E.2d 916, 918 (Va. 2004)). It "requires a degree of negligence that would shock fair-minded persons, although demonstrating something less than willful negligence." Id.

Hicks has not met this demanding standard. His sworn submissions regarding his placement in the RHU fall short of creating a triable issue as to whether any of the defendants acted with complete neglect to his safety or engaged in the type of egregious conduct that would shock fair-minded individuals. See Wilkins v. Montgomery, 751 F.3d 214, 229 (4th Cir. 2014) (providing examples of the types of "far more egregious" Virginia cases in which gross negligence claims were allowed to proceed to trial, including a case in which a "260-pound football coach aggressively tackled a 13-year-old, 144-pound, inexperienced football player, breaking his left arm," and a case in which a "driver of an automobile deliberately increased speed on a straight portion of a narrow road, which had an

upcoming curve that [the] driver knew about, and the car skidded 46 feet and collided head-on with a tree, severely injuring the passengers") (internal quotation marks omitted) (citing Koffman v. Garnett, 265 Va. 12, 574 S.E.2d 258 (Va. 2003); Nichols v. Brizendine, 210 Va. 158, 169 S.E. 2d 457, 460 (Va. 1969)). Thus, the motion for summary judgment filed by Dotson and other defendants will be granted as to the claim of gross negligence asserted against them.

**B. Remaining Claims**

As noted above, the court's review of the amended complaint indicates that Hicks intended to name E. Earhart as a "defendant." See Am. Compl. at 4. Hicks alleges that Earhart was present for the initial ICA hearing held on October 31, 2023, and that Earhart "turned his back to the rest of the room and had a private conversation with the Assistant Warden Bateman concerning [Hicks] which everyone else in the room wasn't privilege to." Id. Elsewhere in the complaint, Hicks alleges that he was treated differently than other inmates charged with the same disciplinary infraction because a staff member "had a sexual relationship with" the nurse he was charged with threatening, id. at 6, 15, and he has since identified that staff member as Earhart. See Pl.'s Sworn Resp. Opp'n at 5.

Hicks also claims that MacVean retaliated against him for complaining and filing grievances. In his amended complaint, Hicks alleges that MacVean prevented him from being released any sooner from the RHU because Hicks reported that his confinement was illegal. Am. Compl. at 13. And he emphasizes in response to the pending motion for summary judgment that he "grieve[d] his placement in Restorative Housing" and was told by

MacVean that he would have to remain in the RHU because of his complaints about the program being illegal. Pl.'s Sworn Resp. Opp'n at 39.

Recent decisions from the United States Court of Appeals for the Fourth Circuit make clear that courts must "read[] pro se pleadings liberally and interpret[] them to raise the strongest arguments that they suggest," Shaw v. Foreman, 59 F.4th 121, 127 (4th Cir. 2023) (internal quotation marks and alterations omitted), and that "[w]hen the body of a pro se complaint makes it clear that an additional party is intended as a defendant, the district court must act accordingly," Nichols v. Bumgarner, 173 F.4th 511, 519 (4th Cir. 2026). Consistent with these decisions, the court will direct the Clerk to add Earhart as a defendant and require the defendants to respond to Hicks's claims of discrimination and retaliation. See, e.g., Carter v. Cabell, ___ F.4th ___, 2026 WL 2235294, at *10 (4th Cir. Aug. 4, 2026) (concluding that an inmate's First Amendment claim of retaliation should have survived a motion to dismiss where the inmate alleged that he regularly complained to defendants about needing to be transferred out of the RHU and was told that his complaints played a role in denying his requested transfer); Joyner v. Fleming, No. 7:16-cv-00486, 2019 WL 1264893, at *3–4 (W.D. Va. Mar. 19, 2019) (addressing similar claims of discrimination and retaliation on summary judgment).

## V. Conclusion

For the reasons stated, the motion for summary judgment filed by Dotson and other defendants, ECF No. 34, is **GRANTED** as to the claims addressed in the motion. E. Earhart will be added as a defendant, and the defendants will be required to address the claims of discrimination and retaliation asserted in the amended complaint.

An appropriate order will be entered.

Entered: August 19, 2026



Mike Urbanski
Senior U.S.
District Judge
2026.08.19
13:36:47 -04'00'

Michael F. Urbanski
Senior United States District Judge